UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

BONNIE MUSHTARE

        Plaintiff,

    v.                      **REPORT AND RECOMMENDATION**
                                       **7:06-CV-1055 (LEK/VEB)**

MICHAEL J. ASTRUE[1]
COMMISSIONER OF SOCIAL SECURITY,

        Defendant,

## I.    Introduction

Plaintiff Bonnie Mushtare brings this action pursuant to the Social Security Act ("the Act"), 42 U.S.C. §§ 405(g), 1383(c)(3), seeking review of a final decision of the Commissioner of Social Security ("Commissioner"), denying her application for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI").[2] Specifically, Plaintiff alleges that the decision of the Administrative Law Judge ("ALJ") denying her applications for benefits was not supported by substantial evidence and contrary to the applicable legal standards. The Commissioner argues that the decision was supported by substantial evidence and made in accordance with the correct legal standards.

For the reasons set forth below, the Court finds the Commissioner's decision is not supported by substantial evidence. Therefore, the Court recommends that the Plaintiff's motion for judgment on the pleadings be granted and Defendant's cross-

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael J. Astrue is substituted as the Defendant in this suit.
[2] This case was referred to the undersigned for Report and Recommendation, by the Honorable Norman A. Mordue, pursuant 28 U.S.C. § 636(b)(1)(B), by an Order dated April 10, 2009.

motion for judgment on the pleadings be denied.[3]

## II.    Background

On June 8, 2004, Plaintiff, then 42 years old, filed an application for SSI and DIB, claiming disability since June 25, 2001, because of fibromyalgia[4] and back impairments (R. at 106-08, 522-31).[5] Her application was denied initially on August 20, 2004 (R. at 50, 55-59, 539-44). Plaintiff filed a timely request for a hearing on September 8, 2004 (R. at 62).

On January 6, 2006, Plaintiff and her attorney appeared before the ALJ (R. at 545-610).The ALJ considered the case *de novo* and, on February 7, 2006, issued a decision finding Plaintiff was not disabled (R. at 33-47). The ALJ's decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review on August 17, 2006 (R. at 7-9). On August 31, 2006, Plaintiff filed this action disputing her disability determination.

Based on the entire record, the Court recommends the Commissioner's decision be remanded because the ALJ failed to consider the nature of Plaintiff's fibromyalgia. Moreover, his credibility and treating physician analyses were not supported by substantial evidence.

## III.    Discussion

### A. Legal Standard and Scope of Review

A court reviewing a denial of disability benefits may not determine *de novo*

---

[3] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings . . . ." General Order No. 18. (N.D.N.Y. Sept. 12, 2003).
[4] Fibromyalgia is "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points." Dorland's Illustrated Medical Dictionary 711 (31st ed. 2007) [hereinafter Dorland's].
[5] Citations to the underlying administrative record are designated as "R."

whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383 (c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); see Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).   "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other

words, this Court must afford the Commissioner's determination considerable

deference, and may not substitute "its own judgment for that of the [Commissioner],

even if it might justifiably have reached a different result upon a *de novo* review."

Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

The Commissioner has established the following five-step sequential evaluation

process to determine whether an individual is disabled as defined under the Social

Security Act. See 20 C.F.R. §§ 416.920, 404.1520.

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity. If he is not, the
> [Commissioner] next considers whether the claimant has a "severe
> impairment" which significantly limits his physical or mental ability to do
> basic work activities. If the claimant has such an impairment, the
> third inquiry is whether, based solely on medical evidence, the claimant has an
> impairment which is listed in Appendix 1 of the regulations. If the claimant
> has such an impairment, the [Commissioner] will consider him disabled
> without considering vocational factors such as age, education, and work
> experience; the [Commissioner] presumes that a claimant who is afflicted
> with a "listed" impairment is unable to perform substantial gainful activity.
> Assuming the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, he has the
> residual functional capacity to perform his past work. Finally, if the
> claimant is unable to perform his past work, the [Commissioner] then
> determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v.

Callahan, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. §§ 416.920, 404.1520.

**B. Analysis**

**1.      The Commissioner's Decision**

Before engaging in the sequential analysis, the ALJ concluded that Plaintiff's

application included an implied request to reopen her prior application for disability

benefits (R. at 38). The ALJ reviewed the evidence of record and decided not to reopen

4

the prior determination. Id. Then, the ALJ followed the sequential analysis. At step one,

the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since her

alleged date of disability onset (R. at 39). At step two, the ALJ concluded that Plaintiff

had "medically determinable impairments which impose more than minimal limitations

on her ability to work." Id. At step three, the ALJ found that Plaintiff's impairments did

not meet or equal a Listed impairment. Id. The ALJ then summarized most of the

medical evidence in Plaintiff's case (R. at 39-42). The ALJ assigned "only slight weight"

to Plaintiff's treating physician's opinion that Plaintiff "remains totally disabled" (R. at

41). The ALJ considered Plaintiff's subjective statements of pain and other symptoms

and found her "not fully credible" (R. at 42-44). At step four, the ALJ determined that

Plaintiff had the residual functional capacity ("RFC") to "occasionally lift[] up to 10

pounds at a time, frequently lift[] or carry[] articles like docket files, ledgers, and small

tools, . . . perform repetitive hand/finger actions, [w]ith normal workday breaks . . . sit for

. . . up to six hours, and to stand and/or walk up to two hours" (R. at 44). In reaching this

RFC, the ALJ considered medical source statements from Drs. Monica Kwicklis and

George Mtanos,[6] but assigned these opinions "only slight weight" (R. at 45). The ALJ

then found that Plaintiff could not "perform any of her past relevant work." Id. At step

five, the ALJ considered both the testimony of a vocational expert ("VE") and also

Medical Vocational Rules 201.27 through 201.29 in finding that Plaintiff could perform

the jobs of charge clerk, order clerk, receptionist, and security systems monitor (R. at

---

[6] In his decision the ALJ mistakenly refers to Dr. Mtanos as Dr. Howard D. Meny. However, Defendant argues, and the Court agrees, that the ALJ was referring to the opinion of Dr. Mtanos (R. at 45). This is clear because the ALJ referenced particulars of Dr. Mtanos' opinion, identified the Exhibit number of Dr. Mtanos' opinion, and because Dr. Meny did not provide an opinion. See (R. at 45); Defendant's Brief, p. 16 n.3.

46). The ALJ concluded at step five that Plaintiff was not disabled within the meaning of the Act. Id.

## 2.    The Plaintiff's Claims

Plaintiff argues that the ALJ erred in (a) improperly analyzing her credibility; (b) failing to grant controlling weight to her treating physicians' opinions; (c) failing to specify which of her impairments he found severe; (d) failing to find she met Listing 1.04(A); (e) assessing her RFC improperly; and (f) failing to reopen and decide favorably Plaintiff's prior disability claim. Plaintiff's Brief, pp. 12-23.

### a.  The ALJ's Credibility Analysis is Incomplete and Not Supported by Substantial Evidence

Plaintiff argues that the ALJ ignored the first step of the credibility analysis and failed to acknowledge evidence of her persistent attempts to obtain relief from pain in his analysis of the credibility factors. Plaintiff's Brief, pp. 17-18. Defendant argues that the ALJ properly assessed Plaintiff's credibility. Defendant's Brief, pp. 18-20.

"[A] claimant's subjective evidence of pain is entitled to great weight where . . . it is supported by objective medical evidence." Simmons v. U.S. R.R. Retirement Bd., 982 F.2d 49, 56 (2d Cir. 1992) (citations omitted). "However, the ALJ is 'not obliged to accept without question the credibility of such subjective evidence.'" Martone v. Apfel, 70 F.Supp.2d 145, 151 (N.D.N.Y. 1999) (quoting Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)). When rejecting subjective complaints, an ALJ must do so "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987); see SSR 96-7p, 1996 WL 374186, at *4. If the ALJ's findings are supported by

6

substantial evidence, "the court must uphold the ALJ's decision to discount a claimant's subjective complaints [of pain]." Aponte v. Sec'y of Dept. of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984).

In this case the ALJ considered Plaintiff's credibility at length and found Plaintiff "not fully credible" (R. at 42-44). Despite the ALJ's lengthy discussion, the Court concludes that the ALJ's credibility determination is flawed for three reasons.

First, the ALJ failed to complete the first step of the credibility analysis. See Crysler v. Astrue, 563 F.Supp.2d 418, 441 (N.D.N.Y. 2008) (remanding, in part because the ALJ failed to "state in his decision whether plaintiff's medical impairments could reasonably be expected to produce the pain or other symptoms alleged"). The "ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record." Borush v. Astrue, 2008 WL 4186510, at *12 (N.D.N.Y. Sept. 10, 2008) (citations omitted). The first step is to determine whether the claimant has medically determinable impairments, "which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a); S.S.R. 96-7p, 1996 WL 374186, at *2; see also McCarty v. Astrue, 2008 WL 3884357, at *8 (N.D.N.Y. Aug. 18, 2008) (citing S.S.R. 96-7p, 1996 WL 374186)) ("This finding does not involve a determination as to the intensity, persistence, or functionally limiting effects of the claimant's pain or other symptoms. If no impairment is found that could reasonably be expected to produce pain, the claimant's pain cannot be found to affect the claimant's ability to do basic work activities.").

Second, the error of omitting step one was aggravated by the ALJ's failure to "consider the nature of Plaintiff's diagnosed condition." Crysler, 563 F.Supp.2d at 440.

"In fibromyalgia cases, the credibility of the claimant's testimony regarding her symptoms takes on substantially increased' significance in the ALJ's evaluation of the evidence." <u>Coyle v. Apfel</u>, 66 F.Supp.2d 368, 376 (N.D.N.Y. 1999) (internal quotations omitted). This is true, because "[i]n stark contrast to the unremitting pain of which [fibromyalgia] patients complain, physical examinations will usually yield normal results- a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." <u>Preston v. Sec'y of Health & Human Servs.</u>, 854 F.2d 815, 817- 18 (6th Cir. 1988).The Seventh Circuit has described fibromyalgia as follows:

> [F]ibromyalgia, also known as fibrositis [is] a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and-the only symptom that discriminates between it and other diseases of a rheumatic character- multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

<u>Sarchet v. Chater</u>, 78 F.3d 305, 305-06 (7th Cir. 1996) (internal citations omitted). The Second Circuit has also "recognized that fibromyalgia is a disabling impairment and that there are no objective tests which can conclusively confirm the disease." <u>Green- Younger v. Barnhart</u>, 335 F.3d 99, 108 (2d Cir. 2003) (quoting <u>Preston v. Sec. of Health & Human Servs.</u>, 854 F.2d 815, 818 (6th Cir. 1988)). Nevertheless, the ALJ perceived a lack of objective evidence in discrediting Plaintiff's testimony. For example, the ALJ considered Plaintiff complaints of pain as follows:

> Severe pain will often result in certain observable manifestations such as loss of weight due to loss of appetite from incessant pain, muscular

atrophy due to muscle guarding, muscular spasms, the use of assistive devices, prolonged bed rest, or adverse neurologic signs. In the present case, the record shows the claimant has reported muscle spasms, and used a cane to ambulate. However, the medical notes reflecting these conditions do not support her contention of being totally disabled. The record fails to demonstrate any significant medical findings, or any neurological abnormalities that would establish the existence of a pattern of pain of the severity alleged by the claimant, and that would prevent her from engaging in any work on a sustained basis.

(R. at 43). By requiring "significant medical findings," and "neurological abnormalities," the ALJ "effectively require[ed] objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia." Green-Younger, 335 F.3d at 106. This was also error. Id.

Third, the ALJ's remaining credibility analysis is not supported by substantial evidence. At the second step of a credibility analysis, an ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's capacity to work. S.S.R. 96-7p, 1996 WL 374186, at *2; 20 C.F.R. § 404.1529(c); Borush, 2008 WL 4186510, at *12. The ALJ will consider whether objective medical evidence supports the intensity and persistence of alleged symptoms. 20 C.F.R. § 404.1529(c)(2). However, because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," S.S.R. 96-7p, 1996 WL 374186, at *3, an ALJ will consider the following factors in assessing a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7)

9

any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 416.929(c)(3)(i)-(vii).

In this case, the ALJ considered several of the required factors but failed to meaningfully analyze the evidence in such a way that it rendered his analysis and conclusions unsupported by substantial evidence. For example, the ALJ reasoned "[t]he restrictions in performing daily living activities reported by the claimant are not reflected in the notes from her physicians" (R. at 43). The ALJ's reasoning is not a meaningful analysis of Plaintiff's daily activities because it focuses on her doctor's notes rather than her activities. See 20 C.F.R. §§ 404.1529(c), 416.929(c) (directing the ALJ to consider a "[claimant's] daily activities"). The Court concedes that doctor's notes on a claimant's daily activities could be relevant to a credibility analysis if, for example, the notes indicate the claimant can do more activity than she alleged elsewhere in the record. However, in this case, there is no evidence that Plaintiff's physicians asked about her daily activities. More importantly, there is no evidence that her doctors doubted the severity of Plaintiff's pain and other symptoms. To the contrary, as discussed below, the medical record indicates Plaintiff's doctors tried numerous measures to relieve Plaintiff's pain, insomnia and other symptoms. Moreover, the more appropriate analysis of this factor would have been to ask whether Plaintiff's reported daily activities are in conflict with her allegations of pain and other symptoms. The ALJ did not address this critical question.

The ALJ's discussion of Plaintiff's medications was also inadequate. The ALJ reasoned that there was "no evidence" Plaintiff "reported any significant adverse medication side effects to her physicians" and no "findings that she has had persistent

10

and adverse side effects . . . which were not [sic] incapable of being controlled by

medication adjustments" (R. at 44). He noted there was "no indication" that Plaintiff's

medications "significantly limit[ed] her ability to function in or out of the home." Id. The

ALJ's discussion of adverse or limiting side effects from Plaintiff's medications is

irrelevant because Plaintiff did not allege any disabling side effects from her

medications. The more relevant question is whether Plaintiff's medication use is

consistent with or contradictory to her allegations of debilitating pain. A careful review of

the record reveals that Plaintiff was prescribed numerous medications, including

Flexeril,[7] Toradol,[8] Robaxin,[9] Darvocet,[10] Skelaxin,[11] Naprosyn,[12] Topamax,[13]

Baclofen,[14] Execedrin, Ultram,[15] Pamelor,[16] Ambien,[17] Lunesta,[18] Cymbalta,[19] Elavil,[20]

---

[7] Flexeril is a preparation of cyclobenzaprine used to treat muscle spasms and acute, painful musculoskeletal conditions. RxList, Flexeril, http://www.rxlist.com/flexeril-drug.htm (last visited June 26, 2009).

[8] Toradol is a preparation of ketorolac tromethamine. It is a nonsteroidal anti-inflammatory indicated for short-term management of moderately severe acute pain that requires analgesia at the opioid level and only as continuation treatment following intravenous dosing of ketorolac tromethamine, if necessary. RxList, Toradol, http://www.rxlist.com/toradol-drug.htm (last visited June 26, 2009).

[9] Robaxin is a preparation of methocarbamol which acts as a central nervous system depressant with sedative and musculoskeletal relaxant properties. RxList, Robaxin, http://www.rxlist.com/robaxin-drug.htm (last visited June 26, 2009).

[10] Darvocet is a preparation of propoxyphene napsylate and acetaminophen that is indicated for the relief of mild to moderate pain. RxList, Darvocet-N, http://www.rxlist.com/darvocet-n-drug.htm (last visited June 26, 2009).

[11] Skelaxin is a preparation of metaxalone indicated for the treatment of discomfort associated with acute, painful musculoskeletal conditions. RxList, Skelaxin, http://www.rxlist.com/skelaxin-drug.htm (last visited June 26, 2009).

[12] Naprosyn is brand name preparation of naproxen, a nonsteroidal anti-inflammatory drug recommended for use in relieving the symptoms of rheumatoid arthritis or osteoarthritis. RxList, Naprosyn, http://www.rxlist.com/naprosyn-drug.htm (last visited June 26, 2009).

[13] Topamax is a preparation of topiramate, indicated for use as a prophylaxis of migraine headaches. RxList, Topamax, http://www.rxlist.com/topamax-drug.htm (last visited June 26, 2009).

[14] Baclofen is a muscle relaxant and antispastic medication. RxList, Baclofen, http://www.rxlist.com/baclofen-drug.htm (last visited June 26, 2009).

[15] Ultram is a preparation of tramadol hydrochloride indicated for the management of moderate to moderately severe pain. RxList, Ultram, http://www.rxlist.com/ultram-drug.htm (last visited June 26, 2009).

[16] Pamelor is a preparation of nortriptyline, indicated for the relief of symptoms of depression. RxList, Pamelor, http://www.rxlist.com/pamelor-drug.htm (last visited June 26, 2009).

Valium,[21] and Percocet[22] (also known as Roxicet or Oxycodone) (R. at 150, 165, 207, 236, 249, 318, 364, 366, 368, 370, 372, 374-76, 381, 407, 412, 431-32, 436-38). Nonetheless, the ALJ's decision gives no indication he considered the "type, dosage, [or] effectiveness" of these medications or the logical and reasonable inference that a person prescribed such a variety of pain medications in fact experienced severe pain. 20 C.F.R. § 404.1529(c)(3) (listing factors including, "[t]he type, dosage, effectiveness, and side effects of any medications" a claimant takes).

Similarly, the ALJ considered other measures Plaintiff used to relieve her symptoms, noting she "received TENS [unit] therapy and epidural block injections, but the record does not reveal any other specific form of treatment that would bolster her allegation of disabling symptoms" (R. at 44). To the contrary, the record reveals that Plaintiff also tried heating pads, a back brace, lumbar pillows, a cane, and Lidoderm patches (R. at 204, 378, 491, 499), increased the dosages of her medication or tried other medications (R. at 150, 207, 364, 365, 493, 498), tried multiple rounds of physical therapy, tried ultrasound therapy, and lost considerable weight (R. at 284, 287, 367, 382, 402, 404, 408, 433, 451-54, 464, 507), received trigger point injections in addition

---

[17] Ambien is a preparation of zolpidem tartrate, indicated for the short-term treatment of insomnia characterized by difficulty with sleep initiation. RxList, Ambien, http://www.rxlist.com/ambien-drug.htm (last visited June 26, 2009).
[18] Lunesta is a preparation of eszopiclone, used to treat insomnia and improve sleep maintenance. RxList, Lunesta, http://www.rxlist.com/lunesta-drug.htm (last visited June 26, 2009).
[19] Cymbalta is a preparation of duloxetine hydrochloride, indicated for the acute and maintenance treatment of major depressive disorder and for the management of fibromyalgia. RxList, Cymbalta, http://www.rxlist.com/cymbalta-drug.htm (last visited June 26, 2009).
[20] Elavil is a preparation of amitriptyline indicated for use in treating depression. RxList, Elavil, http://www.rxlist.com/elavil-drug.htm (last visited June 26, 2009).
[21] Valium is a preparation of diazepam indicated for the management of anxiety disorders and a useful for the adjunct relief of skeletal muscle spasm. RxList, Valium, http://www.rxlist.com/valium-drug.htm (lat visited June 26, 2009).
[22] Percocet, also known as Roxicet, is a preparation of oxycodone and acetaminophen and is an opioid analgesic indicated for the relief of moderate to moderately severe pain. RxList, Percocet, http://www.rxlist.com/percocet-drug.htm (last visited June 26, 2009).

to epidural injections (R. at 251, 459-62), and, in her attempts to obtain relief, was referred to specialists in neurology, orthopedics, pain management, rheumatology, and occasionally sent to the emergency room (R. at 222, 233, 249-53, 365, 406-08, 431-35, 437, 446-50, 451-62, 499-500). In light of this evidence, it is clear to the Court that the ALJ's analysis is not supported by substantial evidence.

The ALJ also perceived a lack of objective medical evidence. As discussed above, the ALJ's search for objective medical evidence misunderstands the nature of fibromyalgia. "[N]egative findings in the medical records simply confirm a diagnosis of fibromyalgia by a process of exclusion, eliminating other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue." Crysler, 563 F.Supp.2d at 441 (quoting Green-Younger, 335 F.3d at 109). The medical record here shows an extensive history of clinical and laboratory techniques, the results of which all support Plaintiff's diagnosis of fibromyalgia. For example, each time Plaintiff injured her back, in 1995 and again in 2001, her complaints of pain persisted even when x-rays, MRIs, a nerve conduction study, a serum protein electrophoresis test,[23] and a bone scan revealed little observable pathology (R. at 262, 271, 277, 289, 382, 384-85, 387, 415-17). Similarly, Dr. Mtanos, a rheumatologist, specializing in conditions such as fibromyalgia, ordered a bank of tests, which further supported Plaintiff's diagnosis by ruling out other causes of her symptoms (R. at 432) (ordering "CBC [complete blood count], ASA [argininosuccinic acid], ESR [erythrocyte sedimentation rate], CRP [C-reactive protein], ANA [antinuclear antibody], CK [creatine kinase], Lyme titer, and

---

[23] The serum protein electrophoresis test "measures specific proteins in the blood to help identify some diseases." WebMD, Serum Protein Electrophoresis (SPE), http://www.webmd.com/a-to-z-guides/serum-protein-electrophoresis-spe (last visited June 26, 2009).

rheumatoid factor"). Upon remand, the ALJ must consider these normal or negative findings in light of the fact that such results are consistent with Plaintiff's diagnosis of fibromyalgia.

Finally, the ALJ mentioned notations in the record of symptom magnification. However, the ALJ's concern that a physical therapist and a consultative examiner suggested Plaintiff was magnifying her symptoms, while relevant, is an insufficient basis for discrediting Plaintiff's allegations of pain. See (R. at 257, 266, 464). The Court notes that the consultative examiner was unaware of Plaintiff's fibromyalgia (R. at 255-58, 263-67) (showing that the consultative examiner examined Plaintiff more than a year before she was diagnosed with fibromyalgia). It is also possible that the physical therapist was unaware that fibromyalgia can cause the symptoms Plaintiff complained of without exhibiting the traditional signs associated with such complaints (R. at 464). Regardless, the ALJ's credibility analysis remains inadequate and unsupported by substantial evidence in the record. Therefore, the Court recommends remand for further consideration of Plaintiff's credibility, including both steps of the credibility analysis and consideration of all the evidence of record.

### b. The ALJ's Treating Physician Analysis is Not Supported by Substantial Evidence

Plaintiff argues that the opinions of her treating physicians were entitled to controlling weight because they were supported by objective medical evidence and not inconsistent with other substantial evidence of record. Plaintiff's Brief, p. 15. Defendant argues that the ALJ properly evaluated the treating physicians' opinions and points out

14

that independent worker's compensation medical examiner Dr. Jose Lopez' opinions contradicted the treating physician's opinions. Defendant's Brief, p. 16-17.

The treating physician rule requires an ALJ to give controlling weight to a "treating source's opinion[s] on the issue(s) of the nature and severity of [a claimant's] impairment(s)" if the opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); see also Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999). Even if an ALJ does not grant controlling weight to the treating physicians' opinions, he "will always give good reasons . . . for the weight [he] give[s] [a] treating source's opinion." 20 C.F.R. § 404.1527(d)(2)

In this case, Dr, Kwicklis, Plaintiff's primary care physician, and Dr. Mtanos, Plaintiff's rheumatologist, opined that Plaintiff was limited to less than sedentary work. In relevant part, Dr. Kwicklis opined that Plaintiff could lift and carry no more than ten pounds, could only sit for one hour at a time, could only walk or stand for one hour or less at a time, and could only occasionally use her right hand (R. at 503-05). Dr. Mtanos similarly opined that Plaintiff could lift or carry no more than ten pounds, could sit for one hour at a time for a total of two hours a day, could stand or walk for one hour or less at a time for a total of two hours a day, and could only occasionally use her right hand and frequently, but not continuously, use her left hand (R. at 508-09). The ALJ considered these opinions but nonetheless discounted them, stating:

> These opinions are not supported by their own medical notes, or the claimant's other medical records. The record likewise does not reflect any clinical or objective tests to establish that the claimant has functional restrictions on her ability to use her hands for fingering, feeling, or fine manipulation. She did report complaints of numbness and tingling in the

> fingers, but these complaints are not consistently addressed by her physicians, or reported by the claimant. . . . In the present case, the functional assessments by Dr. [Mtanos] and Dr. Kwicklis are not supported by the record as a whole, and not corroborated by their own clinical notes of the claimant's treatment. The undersigned therefore attributes only slight weight to these assessments.

(R. at 45).

The Court notes the ALJ offered no explanation for the assertion that the treating physicians' opinions were "not supported by the record as a whole" or "their own clinical notes."[24] It is not clear the ALJ could have explained these statements because the record contains ample support for the treating physicians' diagnosis of fibromyalgia and their opinions concerning Plaintiff's related limitations.

Although Plaintiff was not initially diagnosed with fibromyalgia, the record clearly indicates that early on her doctors suspected the root cause of her symptoms was something other than her two back injuries. For example, after Plaintiff's first back injury in June 1995, her orthopedic specialist, Dr. Arthur Peckham, Jr. commented that Plaintiff had a "somewhat unphysiologic total back area of pain" (R. at 226). Dr. Peckham ordered several tests to screen for "inflammatory arthritic disease" and other conditions to "be sure we are not dealing with some more unusual problem" and eventually referred her to neurologist, Abdul Latif, M.D., due to the "somewhat unusual nature of the symptoms" (R. at 222, 226, 382-83). As early as August 17, 1998, neurologist, Dr. Latif, diagnosed Plaintiff with myofascial pain, a condition similar to

---

[24] The ALJ offered one specific reason for rejecting a portion of the treating physicians' opinions when he reasoned that Plaintiff's complaints of numbness and tingling in her hands were "not consistently addressed by her physicians" (R. at 45). However, Dr. Mtanos explained "essentially joint movement/stress aggravates symptoms regardless of which joint is involved" (R. at 509). The ALJ did not explain why he rejected this explanation, nor did he point to any medical opinion contrary to Dr. Mtanos' opinion.

fibromyalgia (R. at 379).[25] Plaintiff's orthopedic specialists, Dr. Peckham and also Dr.

Douglas Sloan, noted that some of Plaintiff's symptoms were not clearly explained by

her orthopedic impairments (R. at 220, 280) (her paresthesias "at this point are not

accounted for" and she has ongoing pain "but nothing to point to a specific nerve root").

In 2002, the first time Plaintiff was referred to a pain specialist, Dr. Andre Chaput found

"multiple trigger points and exquisite tenderness to very light touch" and diagnosed her

with "[m]yofascial pain syndrome" (R. at 250-51). Later in 2002, her orthopedic

specialists discontinued treatment because "she has not responded here" and they had

done all they could for her (R. at 268, 402). On February 4, 2004, Dr. Latif diagnosed

Plaintiff with fibromyalgia and referred her for a "rheumatological evaluation" to confirm

the diagnosis (R. at 365-67). Rheumatologist, Dr. Mtanos examined Plaintiff and found

"presentation is consistent with a diagnosis of fibromyalgia," "tender fibromyalgia points

in the usual distribution," and "exquisitely tender fibromyalgia points" (R. at 431, 433-

34). Dr. Mtanos characterized Plaintiff's fibromyalgia as marked by "chronic pain,"

"symptomatic with probable underlying depression" and having "chronic

symptomatology" (R. at 431, 433, 507). Furthermore, every laboratory or clinical

diagnostic technique documented in the record confirms Plaintiff's fibromyalgia and the

examinations of at least ten physicians of various specialties were also consistent with

her diagnosis (R. at 220-26, 222, 249-53, 262, 268-87, 271, 277, 289, 364-83, 382, 384-

85, 387, 397-412, 415-17, 431-35, 446-50, 451-54, 497-98).The record clearly supports

Plaintiff's diagnosis of fibromyalgia and the ALJ's implicit rejection of this opinion is not

supported by substantial evidence.

---

[25] Myofascial pain is "pain attributed to trigger points in muscles and their fascia, with more specific points of origin than with fibromyalgia." Dorland's, at 1384.

The record further supports the treating physicians' opinions of Plaintiff's limitations. In his medical source statement, Dr. Mtanos had explained that "prolonged sitting/standing/walking causes pain in the spine and lower extremities" (R. at 509). He explained her postural and manipulative limitations, stating "[e]ssentially joint movement/stress aggravates symptoms regardless of which joint is involved." Id. At Plaintiff's hearing, the ALJ informed Plaintiff's attorney that he felt Dr. Mtanos' opinions were not consistent with his treatment notes (R. at 548). The Court has carefully reviewed Dr. Mtanos' treatment notes and finds them entirely consistent with Dr. Mtanos' opinions. Nonetheless, in response to the ALJ's concern, Dr. Mtanos submitted an affidavit further explaining his opinions (R. at 520-21). In his affidavit, Dr. Mtanos restated Plaintiff's diagnosis of fibromyalgia and explained that the condition can cause the limitations he had set forth in his medical source statement (R. at 521). Moreover, it was his opinion "to a reasonable degree of medical certainty" that fibromyalgia caused the stated limitations in Plaintiff's case. Id. Dr. Mtanos explained that his opinions were based upon his "education and training," "review of the medical records," conversations with the Plaintiff, and "personal examination of [Plaintiff]" (R. at 520). Dr. Mtanos further stated, Plaintiff "[h]as consistently shown multiple tender points consistent with fibromyalgia. Her insomnia, depression, and aggravation of symptoms, based upon joint movement, are not unusual for a person with fibromyalgia and are consistent with my diagnosis." Id. In addition to Dr. Mtanos' explanations, the opined limitations are supported by Dr. Kwicklis' opinions (R. at 502-06), consistent with a functional capacity

assessment (R. at 304-14)[26], and repeated in Plaintiff's own statements (R. at 142-43,

147-51, 167, 199-204, 561-72).

    The only evidence of record that could be considered inconsistent with the

treating physicians' opinions was not cited by the ALJ in his decision, and does not

constitute substantial evidence in this case. Dr. Jose R. Lopez, an independent medical

examiner for Worker's Compensation, examined Plaintiff on October 11, 2001 and

August 2, 2002 (R. at 255-58, 263-67). On each occasion, Dr. Lopez opined that

Plaintiff should be able to return to work with a ten to fifteen pound lift limit and the

ability to "change positions frequently" (R. at 258, 267). Defendant argues that this is

sufficient evidence to contradict the treating physicians' opinions. Defendant's Brief, p.

17. However, Dr. Lopez' opinions are not substantial evidence because he did not

consider fibromyalgia as a source of Plaintiff's symptoms. See Green-Younger, 335

F.3d 99 (finding a consultative examiner's opinion not substantial evidence sufficient to

contradict a treating physician's opinion where the consultant did not consider

fibromyalgia as a source of claimant's symptoms). Furthermore, had the ALJ weighed

Dr. Lopez opinions using the listed factors he would have had to consider the fact that

Dr. Lopez' specialty is pediatrics (R. at 426). See 20. C.F.R. § 404.1527(d)(5) ("[The

Commissioner] generally give[s] more weight to the opinion of a specialist about

medical issues related to his or her area of specialty than to the opinions of a source

who is not a specialist.").

---

[26] Physical therapist Wendy Alford-Tousley conducted a functional capacity evaluation that was estimated to be 67% valid (R. at 304-14). Though of perhaps limited value, Ms. Alford-Tousley's findings are generally consistent with Dr. Mtanos' opined limitations. Ms. Alford-Tousley found Plaintiff could lift up to 6.5 pounds, sit, stand and walk occasionally (i.e. a third of the day or approximately two and half hours daily), and had various postural limitations (R. at 304, 306-07).

Based upon the foregoing evidence, the Court concludes that the ALJ's treating physician analysis is not supported by substantial evidence and recommends the decision be remanded for further consideration in light of all the evidence.

Plaintiff has also argued that the ALJ should have assigned the treating physicians' opinions extra weight based on the listed factors and that the ALJ should have recontacted the physicians if he "did not understand the basis" of their opinions. Plaintiff's Brief, pp. 15. As the ALJ's analysis has already been found unsupported, the Court merely notes that upon remand, should the ALJ properly decline controlling weight to the treating physicians' opinions, he must apply the listed factors in "determining the weight to give the opinion[s]." 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6); see S.S.R. 96-2p, 1996 WL 374188, at *4 (reminding adjudicators that "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."). Similarly, should the ALJ find the record inadequate, as described by the regulations, he should recontact Plaintiff's treating physicians. See 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

### c.  The ALJ Properly Found All Plaintiff's Impairments Severe at Step Two

Plaintiff argues the ALJ was required to specify which of Plaintiff's impairments he found severe at step two. Plaintiff's Brief, pp. 18-19. Defendant argues that the ALJ properly found Plaintiff's impairments severe. Defendant's Brief, p. 11.

In this case, at step two the ALJ stated:

> [Plaintiff] alleges disability and an inability to work due to impairments including injuries to her back, neck, leg, and spine, chronic

headaches, and fibromyalgia. The pertinent evidence establishes that she has medically determinable impairments which impose more than minimal limitations on her ability to work. She therefore has a "severe" impairment.

(R. at 39).

The regulations require an ALJ to "consider the medical severity of [a claimant's] impairment(s). . . . [because if a claimant does] not have a severe medically determinable physical or mental impairment . . . or a combination of impairments that is severe and meets the duration requirement, [the Commissioner] will find that [the claimant] not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An ALJ will find an impairment severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a).

In this case, the ALJ clearly considered the medical severity of Plaintiff's impairments. The ALJ found that Plaintiff had "medically determinable impairments" and further found those impairments imposed "more than minimal limitations in her ability to work" (R. at 39). Based upon the ALJ's use of the plural "impairments," it is reasonable to conclude that the ALJ found more than one impairment met the definition severity. Based on the structure of the ALJ's paragraph, it is further reasonable to assume that the multiple impairments considered, were those listed. Although the ALJ could have worded his finding more clearly, the failure to do so in this case is not a basis for remand in this case.[27] In this case, the Court finds that the ALJ considered all of Plaintiff's medical impairments and found all of them severe.

---

[27] Courts have required an ALJ to clarify which impairments were found severe, but only when the Plaintiff was alleging that he or she met Listing 12.05(C), which requires an additional severe impairment. See, e.g., Baneky v. Apfel, 997 F. Supp. 543, 546-47 (S.D.N.Y. 1998) (remanding for a specific finding by the ALJ as to whether another impairment was severe within the meaning of Listing 12.05(C)).

The Court notes that Plaintiff also argued that the ALJ's failure to "specify[] which of plaintiff's conditions impair her ability to work" would allow the ALJ to "avoid[] having to include all of plaintiff's specific impairments in the assessment of her residual functional capacity." Plaintiff's Brief, p. 19. In so arguing, Plaintiff misunderstands the law. In assessing a claimant's RFC, an ALJ must consider" all of [a claimant's] medically determinable impairments of which [he is] aware, including [a claimant's] medically determinable impairments that are not 'severe.'" 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

### d.  The ALJ's Determination that Plaintiff Did Not Meet a Listing is Supported by Substantial Evidence

Plaintiff argues that she meets Listing 1.04(A). Plaintiff's Brief, pp. 12-13. At step three, Plaintiff has the burden of proof to show that her impairments meet or medically equal a Listing. Naegele v. Barnhart, 433 F.Supp.2d 319, 324 (W.D.N.Y. May 31, 2006). To meet a Listing, Plaintiff must show that her medically determinable impairment satisfies all of the specified criteria in a Listing. 20 C.F.R. §§ 404.1525(d), 416.925(d). If a claimant's impairment "manifests only some of those criteria, no matter how severely," such impairment does not qualify. Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (citing S.S.R. 83-19, 1983 WL 31248).

Listing 1.04A, of Appendix 1, Subpart P, Regulations No. 4, states:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness)

22

accompanied by sensory or reflex loss and, if there is involvement of
the lower back, positive straight-leg raising test (sitting and supine);…

20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A, § 1.04.

In his decision, the ALJ found that Plaintiff's impairments "do not meet or equal
the criteria set forth in section 1.00 *et seq* of the amended Listing of Impairments, or any
of the other listed impairments found in Appendix 1 . . ." (R. at 39). Thus, the ALJ found
that Plaintiff did not meet any of the musculoskeletal listings, which include Listing
1.04(A). Courts have required an ALJ to provide an explanation as to why the claimant
failed to meet or equal the Listings, "[w]here the claimant's symptoms as described by
the medical evidence appear to match those described in the Listings." Kuleszo v.
Barnhart, 232 F.Supp.2d 44, 52 (W.D.N.Y. Sept. 30, 2002). However, if an ALJ's
decision lacks an express rationale for finding that a claimant does not meet a Listing, a
Court may still uphold the ALJ's determination if it is supported by substantial evidence.
Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir. 1982). In this case, the Court finds the
ALJ's determination that Plaintiff did not meet the requirements of Listing 1.04(A) was
supported by substantial evidence in the record.

There is evidence that Plaintiff was diagnosed with degenerative disc disease in
the lumbar and cervical spines (R. at 400, 411, 502) and at various times experienced
neuro-anatomic distribution of pain (R. at 387, 406, 408), limitation of motion in her
spine and neck (R. at 220, 279, 282, 287, 377, 391), some sensory loss (R. at 220, 222,
282, 383), and some positive or partially positive straight-leg raising tests (R. at 250,
280, 282, 391, 398, 406, 412, 434, 502), However, the record also showed that Plaintiff
had no motor loss (R. at 266, 279, 284, 287, 364-83, 398), negative straight leg raising

23

or flip tests (R. at 257, 266, 280, 287), and a distribution of pain that was not neuro-anatomic (R. at 226, 280).

The record also contains repeated MRIs and x-rays, which taken as a whole indicate that Plaintiff has no compromise of a nerve root or the spinal cord. Plaintiff's first injury occurred on June 6, 1995. On July 28, 1995, her x-rays were essentially normal, but did show a Bertolotti's abnormality, which was not considered a contributor to Plaintiff's pain (R. at 225-26). A lumbosacral MRI from 1995 showed a minimal disc bulge at the L4-5 level (R. at 382). A January 1998 MRI revealed a normal cervical spine (R. at 385). Plaintiff was injured again on June 26, 2001. An x-ray on July 2, 2001, showed an "essentially unremarkable lumbosacral spine," but an MRI on July 27, 2001, showed "degenerative changes encroaching on the thecal sac" at T11-12, and "mild degenerative encroachment . . . on the left neural foramen at L4-L5" (R. at 416-17). Dr. Kwicklis characterized the MRI as "show[ing] some degenerative changes, but no disc problem" (R. at 408), while orthopedic specialist Dr. Walker R. Heap, noted "mild foraminal degenerative encroachment on the left in the foramen at L4/5" (R. at 287).  By March 4, 2002, another MRI of Plaintiff's lumbosacral spine still showed a focal disc herniation at the T11-T12 segment, but revealed no foraminal encroachment (R. at 289). It was considered a normal result for Plaintiff's age. Id. On May 23, 2002, Plaintiff had a normal bone scan (R. at 415). On July 25, 2002, an MRI of Plaintiff's thoracic spine looked more closely at the "small focal disc protrusion at T11-T12," which was "not associated with any deformity of the spinal cord or significant compromise of the cross sectional area of the spinal canal" (R. at 262). On January 21, 2004, another MRI revealed a normal cervical spine (R. at 384).

Furthermore, doctors questioned whether Plaintiff's symptoms were attributable only to her back impairments alone. For example, Dr. Peckham found Plaintiff's symptoms unusual (R. at 222, 226) and Dr. Sloan felt Plaintiff's pain was not explained by "a specific nerve root" (R. at 280). On May 20, 2004, workers compensation medical examiner, Dr. Donald Paarlberg, a board certified orthopeadic surgeon, reviewed all of Plaintiff's medical records to date and opined that Plaintiff had "[c]hronic mechanical low back pain" and "[c]hronic cervical sprain/strain" each  "with very little objective findings" (R. at 392, 429). On September 21, 2005, Dr. Mtanos noted that Plaintiff's neck and lumbar spine movements were very limited and opined this was "probably mainly" secondary to her pain (R. at 431).

In light of the record as a whole, the Court finds substantial evidence supported the ALJ's finding that Plaintiff did not meet Listing 1.04(A). Although some evidence indicated Plaintiff met some of the necessary criteria, there was no evidence that Plaintiff experienced the necessary motor loss, and there was only questionable evidence that she had the necessary compromise of a nerve root or the spinal cord. Therefore, the ALJ's determination is supported by substantial evidence in the record.

### e.   The ALJ's RFC Determination is Flawed by His Failure to Properly Credit Plaintiff's Treating Physicians' Opinions

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because he improperly failed to grant controlling weight to the opinions of Plaintiff's treating physicians. Plaintiff's Brief, pp. 19-21. Plaintiff further argues that the flaws in the RFC led the ALJ to improperly rely upon the testimony of the VE and Medical Vocational Guideline Rules 201.27-201.29. Plaintiff's Brief, pp. 21-22.

Defendant argues that the RFC determination was supported by substantial evidence, including the VE's testimony. Defendant's Brief, pp. 13-15, 20-22.

Because the Court has already found that Plaintiff improperly failed to grant controlling weight to Plaintiff's treating physicians' opinions and improperly discredited Plaintiff's statements, the Court also finds that the ALJ's RFC determination is unsupported by substantial evidence. The Court notes that on remand the ALJ must reconsider not only Plaintiff's RFC but also any further VE testimony.

### f.   The Court Lacks the Jurisdiction to Review the ALJ's Decision to Not Reopen Plaintiff's Prior Application for Disability Benefits

Plaintiff argues that her prior application should have been reopened and decided favorably. Plaintiff's Brief, pp. 22-23. Defendant argues that the ALJ properly declined to reopen Plaintiff's prior case because her diagnosis of fibromyalgia was not persuasive proof of disability. Defendant's Brief, p. 23-24.

"As a general rule, federal courts lack jurisdiction to review an administrative decision not to reopen a previous claim for benefits." Byam v. Barnhart, 336 F.3d 172, 178 (2d Cir. 2003) (citing Califano v. Sanders, 430 U.S. 99, 107-09 (1977) (explaining that a decision to not reopen a case is not 'final decision' as required for judicial review under Section 405(g) of the Social Security Act). The Second Circuit has explained that nonetheless, "federal courts may review the Commissioner's decision not to reopen a disability application in two circumstances: where the Commissioner has constructively reopened the case and where the claimant has been denied due process." Id. at 180. Because Plaintiff does not allege either of these two exceptions, nor does the record indicate Plaintiff would be successful on either ground, this Court lacks jurisdiction to

review the ALJ's decision to not reopen Plaintiff's prior application.

## IV.    Conclusion

Based on the foregoing, the Court recommends that the Commissioner's decision denying disability benefits be REMANDED for further proceedings in accordance with this recommendation and pursuant to sentence four of 42 U.S.C. Section 405(g).

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge

DATED: July 27, 2009

Syracuse, New York

### Orders

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an**

**extension of such time waives the right to appeal the District Court's Order.**

<u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Small v. Sec'y of Health & Human Servs.</u>, 892

F.2d 15 (2d Cir.1989); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d 55 (2d Cir.1988).

      **SO ORDERED**.

      DATED: July 27, 2009

      Syracuse, New York

Victor E. Bianchini
United States Magistrate Judge

28